**SO ORDERED.**

**SIGNED this 2 day of October, 2020.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| DAVID WAYNE ROUSE | 16-05920-5-JNC |
| DEBTOR | CHAPTER 12 |

## ORDER DENYING MOTION FOR HARDSHIP DISCHARGE

The matter before the court is the Motion for Hardship Discharge (Dkt. 203; the "Motion")

filed by debtor David W. Rouse on July 23, 2020.  An objection (Dkt. 207; the "Objection") thereto

was filed by Nutrien Ag Solutions, Inc. f/k/a Crop Production Services, Inc. ("Nutrien") on August

25, 2020. As required by 11 U.S.C. § 1228(f), a hearing on the Motion was noticed and held on

September 2, 2020 in Greenville, North Carolina. David F. Mills appeared as counsel for the

chapter 12 Debtor and J. Michael Fields appeared as counsel for Nutrien. The chapter 12 trustee

John C. Bircher, III, ("Trustee") also appeared and participated. At the conclusion of the hearing,

the court took the matter under advisement and now enters this decision.

## BACKGROUND

Farming is a tough business. Farmers are at the mercy of nature and other uncontrollable

events.  Hurricanes, drought, extreme heat waves, crop blight, international trade wars, and global

pandemics relentlessly attack the farming economy. If these risks are combined with a random act

of senseless violence resulting in severe bodily injuries on a farmer, the struggle becomes insurmountable.

David W. Rouse filed a voluntary petition for relief under chapter 12 of the Bankruptcy Code on November 16, 2016.  His amended chapter 12 plan (Dkt. 69), with further agreed changes, was confirmed by order entered May 23, 2017 (Dkt. 92; the "Confirmed Plan"). The effective date of the Confirmed Plan was June 7, 2017 (the "Effective Date"). Nutrien is the holder of an allowed general unsecured claim in the amount of $945,348.31, as evidenced by Amended Proof of Claim No. 14-2. It holds the largest unsecured claim in the case by far.

The chapter 12 case proceeded post-confirmation until the summer of 2020. On June 27, 2020, Mr. Rouse suffered multiple gunshot wounds inflicted by a disturbed assailant. After shooting Mr. Rouse, the assailant killed two other persons at a near-by location before turning the gun on himself. Mr. Rouse spent more than a month in the hospital for treatment of wounds to his torso, chest, arms, and hands. His injuries include shattered bones, finger amputation, muscle damage, nerve damage, and vascular damage. He has undergone multiple surgeries, and more operations are necessary. He needs extensive physical therapy and is dependent on his wife and health care workers for assistance with basic needs. As a result of his extensive injuries and continuing recovery period, and through no fault of his own, Mr. Rouse is unable to farm for the foreseeable future.

Meanwhile, Mr. Rouse's living expenses accumulate unabated, and substantial medical bills continue to accrue. Some assets have been liquidated with attendant distributions to creditors, but making future periodic payments as specified in the Confirmed Plan is not possible. Consequently, Mr. Rouse seeks a hardship discharge in his chapter 12 case. At the hearing and in its Objection, Nutrien maintains that a hardship discharge cannot be granted because Mr. Rouse has not satisfied the

2

liquidation test analysis contained in the Confirmed Plan and required under chapter 12 of the Bankruptcy Code.

## ANALYSIS

Upon full performance of a chapter 12 plan, a debtor is entitled to receive an order of discharge pursuant to Section 1228(a) of the Bankruptcy Code. Mr. Rouse acknowledges that he has not fully completed his chapter 12 plan.  Instead, he seeks the alternative path to discharge offered by Section 1228(b) of the Bankruptcy Code, which controls early or hardship discharge. Section 1228(b) provides that any time after confirmation of a chapter 12 plan, but before completion, the court may grant the debtor a discharge where:

> (1) the debtor's failure to complete such [plan] payments is due to circumstances for which the debtor should not justly be held accountable;
> (2) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 of this title on such date; and
> (3) modification of the plan under section 1229 of this title is not practicable.

11 U.S.C. § 1228(b).

An unforeseen change in the health of the farmer can satisfy the first requirement of the statute. *See In re Grimm*, 145 B.R. 994, 998 (Bankr. D.S.D. 1992).  A chapter 12 hardship discharge requires the presence of "catastrophic circumstances." *In re Fenning*, 175 B.R. 475, 478 (Bankr. N.D. Ohio 1994). The unfortunate event described above certainly qualifies as a catastrophe. At the hearing, counsel for Nutrien and the Trustee did not contest this point and further agreed that under the circumstances, modification of the Confirmed Plan under Section 1229 is not practicable, thereby satisfying subsection (3). Nutrien contends, however, that the requirements in Section 1228(b)(2) have not been met because payments to the general unsecured

3

creditors (Class 11 in the Confirmed Plan), as measured from confirmation, are approximately $19,000 (including interest) short of the minimum required amount.

The mandate that creditors receive over the course of a chapter 12 plan at least as much as they would have received if the case were in chapter 7 is known as the "best interests of the creditors" test. *See Matter of Fortney*, 36 F.3d 701, 704 (7th Cir. 1994). Subject to an agreement to the contrary, meeting or exceeding this minimum distribution is a cornerstone of plan confirmation not only in chapter 12 [11 U.S.C. § 1225(a)(4)], but in chapter 13 [11 U.S.C. §§ 1325(a)(4)] and chapter 11 [11 U.S.C. §§ 1129(a)(7)] as well. The "best interests of the creditors" test is typically met by performing an analysis of the results of a liquidation sale debtor's assets at present value measured against debts, and then demonstrating whether the plan pays each creditor class at least (if not greater than) the corresponding net liquidation amount in periodic payments to be made over its life with interest. The analysis must take "into account the value of the property available to creditors as of the effective date of the plan and then compare that value to what each creditor will be receiving under the plan as proposed." *In re Novak,* 252 B.R. 487, 491 (Bankr. D.N.D. 2000); *In re Perdue,* 95 B.R. 475, 476 (Bankr. W.D. Ky. 1988).

Here, the Confirmed Plan provides a liquidation analysis in its attached Exhibit B (Dkt. 92, pp. 14 and 15; the "Liquidation Analysis").[1] It establishes that, as of the Effective Date (June 7, 2017), the value of Mr. Rouse's retained non-exempt assets, less secured claims and an estimated $10,000 for debtor attorney fees administrative costs, available to pay unsecured creditors in his hypothetical chapter 7 case is $50,687.00. As a result, to satisfy Section 1225(a)(4) of the Bankruptcy Code and obtain chapter 12 plan confirmation in 2017, Mr. Rouse became obligated

---

[1] The Liquidation Analysis is also co-opted into the body of the Confirmed Plan at Article III (Dkt. 92, p. 5).

4

to pay at least this amount with interest over the life of the Confirmed Plan to general unsecured creditors (designated as Class 11). Article III of the Confirmed Plan provides for interest at the rate of 6% per annum on the outstanding balance due to Class 11, resulting in quarterly payments of $2,953.00 (annualized, $11,812.00) during the plan life until paid.

At the confirmation hearing, all objections were resolved, and the proposed Liquidation Analysis was approved on a consent basis. As in most non-cramdown chapter 12 (and chapter 11) cases, the stated treatment and payment amount was the product of negotiation between the affected parties and the chapter 12 trustee. Here, Nutrien actively participated in negotiations with Mr. Rouse and drove the bargain. An appraiser acceptable to both parties determined the auction value of the relevant assets (primarily farm real estate and equipment), and Mr. Rouse, Nutrien, and the Trustee accepted the resulting estimated values at the confirmation hearing.[2]

The parties agree that the $50,687.00 Liquidation Analysis amount must be credited or paid per Section 1228(b)(2) before a hardship discharge may be granted; however, they disagree on which exact payments made under the Confirmed Plan are credited against the balance. They both acknowledge that the unsecured class did not receive level quarterly payments of $2,953.00 as forecast in the Confirmed Plan, but that instead three bulk class distributions totaling $43,465.64 were made, consisting of $8,845.98 on August 31, 2018; $6,221.87 on October 29, 2019; and $28,397.79 on May 15, 2020. The source of some of the payments was the sale of farm assets, and each payment is credited first to accumulated interest and then to the principal balance of the Liquidation Analysis amount.

---

[2] No evidence was presented at the hearing or thereafter as to the origin or efficacy of the 6% interest rate.

Nutrien states that the $50,687.00 Liquidation Analysis starting point remains intact for hardship discharge consideration, contending that it can credited over the life of the plan solely by distributions made to the unsecured creditors. It avers that the Liquidation Analysis took into account an agreed $10,000 debtor attorney fees estimate as reflected in Exhibit B, which was offered into evidence without objection at the confirmation hearing. The stated amount, Nutrien maintains, is not subject to further credit for otherwise qualifying administrative expenses in excess of the $10,000 allotment brought to the forefront three years later at the hardship discharge hearing.  Nutrien calculates that the balance remaining as of July 15, 2020 is $19,479.96, by taking that intact $50,687.00 starting balance, applying the three payments totaling $43,465.64 as of the date each was made, and inserting interest accumulating on the resulting outstanding balances at 6% per annum. *See* Objection Ex. B. Nutrien insists that no discharge under Section 1228(b) can be entered for Mr. Rouse until the $19,479.96 outstanding balance (plus accumulating interest) is paid in full.

Mr. Rouse asserts that the July 15, 2020 remaining balance is only $1,125.41. He agrees that the $50,687.00 figure from the Exhibit B Liquidation Analysis is a starting point, but argues that, in a hardship discharge analysis, the number is subject to further adjustment to reflect the *actual* amount of approved debtor legal fees and costs incurred through the Effective Date. The Liquidation Analysis shows only an *estimated* $10,000 in debtor attorney fees, and that the actual subsequently approved, pre-Effective Date debtor attorney fees and costs, he points out, totaled $17,980.43. *See* Order of June 15, 2017; Dkt. 104.[3]  In addition, Mr. Rouse includes a further credit of $400.00 based on an administrative claim allowed and paid to Nutrien in the Confirmed

---

[3] The total consists of $17,487.50 in legal fees and reimbursable costs of $492.93 detailed in the fee application filed by debtor counsel on May 18, 2017 (Dkt. 83).

Plan reimbursing it for fronted appraiser costs. Mr. Rouse maintains that to the extent this $18,380.43 exceeds the estimated $10,000 administrative costs contained in the Liquidation Analysis, he is now entitled to credit the excess amount against the original $50,687.00 as of the Effective Date. He also seeks to replace the Confirmed Plan interest rate of 6% with a lower interest rate of 3% on the unpaid balances. In summary, Mr. Rouse calculates the total remaining balance due to the unsecured class as $1,125.41 as of July 15, 2020, by: (a) taking the starting point of $50,687.00; (b) subtracting the $8,380.43 administrative cost overage, yielding a new starting point of $42,306.57 as of the Effective Date; (c) applying the $43,465.64 of Class 11 payments made on the noted dates; and (d) factoring an annual interest rate at 3% (rather than 6%) on the balances.

Nutrien counters that once a liquidation amount is set and approved in a plan confirmation order, a debtor must meet this minimum distribution target before receiving a hardship discharge under Section 1228(b) regardless of any subsequent change in personal circumstances and fortunes. It maintains that setting the $50,687.00 amount in the Confirmed Plan was a function of pre-confirmation negotiation with mutual give and take. According to Nutrien, a bargain was reached, and all participants are bound whether good or bad in retrospect, as future asset value changes "can cut both ways." Both parties are bound by the estimated agreed values, it says, reached at confirmation and cannot unilaterally modify the consent balance years later. Essentially, Nutrien asserts an equitable estoppel argument for adhering to the Liquidation Analysis calculation, not alterable by a post-confirmation change in circumstances.

In any farm reorganization, unsecured creditors take a calculated risk that a debtor will not be able to "cash out early" and retain profits sooner along with post-confirmation asset

appreciation.[4]  The liquidation value of assets at the time of a chapter 12 plan confirmation is only a snapshot estimate that remains a moving target throughout the life of a plan due to numerous variables. For example, commodity prices will certainly rise and fall; real estate could substantially appreciate; farm equipment will depreciate, but the exact pace cannot be known in advance; and the amount a debtor will receive in the future from government support programs is by its very nature indefinite. Neither the farmer nor the creditors hold an infallible crystal ball at confirmation.

In considering the competing positions of the parties, the court looks first to the language of the statutes and second to the contents of the Confirmed Plan. The parties agree that Section 1228(b) unequivocally requires that each creditor receive, measured as of the Effective Date, at least the value available to it in a hypothetical liquidating chapter 7 version of the case. The methodology of arriving at the liquidation value is not addressed in the statute because each case and plan are unique; parties typically negotiate and look to the specific circumstances before obtaining an agreed confirmable plan. If the parties cannot agree, a valuation hearing must be conducted. The factors noted above are taken into consideration during negotiations along with disposable income requirements.  If an agreement is reached, the parties must live with a differing and unexpected outcome — particularly where, as here, confirmation was not contested.

Mr. Rouse agreed to the Liquidation Analysis net amount in 2017 after negotiation with Nutrien and the Trustee. The fact that actual administrative costs would exceed the estimated costs was knowable at the time; the overage is not a surprise or mutual mistake. Being bound by that earlier agreement, Mr. Rouse is not entitled to inject an additional $8,380.43 retrospective credit.

---

[4]  Notably, the Confirmed Plan specified that Mr. Rouse is entitled to receive a discharge under Section 1225(b)(1)(C) of the Bankruptcy Code after three years of operations if the total due under the Liquidation Analysis and all administrative claims were paid in full. If this had occurred, he would no longer be subject to the disposable income limitations in the fourth and fifth years following plan confirmation.

If the matter had been contested and a valuation hearing held with determinations made by the court, the parties would remain bound now by res judicata principles. The fact that the starting point number is the product of an agreement made three years ago in a plan context rather than in a contested liquidation value hearing is no different.

In addition to the basic fairness of protecting a playing field leveled by agreement, the policy of judicial economy and encouragement of compromise demand protection of consent asset valuations from challenge in subsequent hardship discharge motion settings. Were the court to rule otherwise and only grant issue-preclusion protections for past contested hearings, numerous additional valuation hearings on a piece-by-piece farm equipment basis in chapter 12 cases would result. The starting point here remains the agreed $50,687.00 Liquidation Analysis net amount established in Exhibit B of the Confirmed Plan.

On the other hand, Sections 1225(a)(4) and 1228(b) only require that a present value of the Liquidation Analysis product be or have been paid. To compensate for present value over the life of a three to five year chapter 12 plan, an interest factor is typically added, as was here. Neither statute states that an artificially high interest rate permitted for plan confirmation purposes is binding for discharge purposes, just as a plan confirmation under Section 1225(a)(4) with a plan allowing greater than liquidation value would not bind the outcome in the event of a later Section 1228(b) hardship discharge request. If, for example, a liquidation analysis yielded a $50,000 net amount at the outset but the plan offered a higher figure such as $100,000, the hardship discharge analysis would center on whether the $50,000 (plus interest) liquidation value had been paid, not the higher plan amount previously induced for plan acceptance or other reasons.

Similarly, an artificially high interest rate results in an unnecessary premium in the context of a subsequent hardship discharge analysis. Unlike Section 1225(a)(4), which looks forward to

9

satisfying the "best interest of the creditors" test, Section 1228(b)(2) looks *backwards* from confirmation to determine if the actual amount paid to a class satisfies that test.  If a 6% per annum interest rate is more than the amount necessary to achieve an actual present value measured from the Effective Date, the unsecured class will have received an aggregate payment greater than the liquidation value at confirmation. The operative question is not "Will" but "Did" the unsecured creditors receive at least as much as they would have had the case assets been liquidated in chapter 7 as of a plan's effective date.

The court must therefore consider the actual interest rate today by looking back three years to see if creditors received more than they otherwise would in chapter 7, and if not, determine the difference. Starting with the Liquidation Analysis, Mr. Rouse agreed to pay $50,687.00 in the Confirmed Plan at 6% annual interest accumulating on the outstanding balance. The actual value accruing on those funds since the Effective Date is considerably less than 6%. The most commonly relied upon inflation rate source, the Consumer Price Index ("CPI") produced by the United States Department of Labor, shows that for the entire three-year period at issue (July 2017 to July 2020), the *combined* inflation rate for that period is 5.8479%. This three-year amount is less than the annual 6% rate contained in the Confirmed Plan.[5]  Given that 6% is three times the actual annual inflation rate required to give the creditors present value from the starting point, a retrospective rate must be substituted.

At the hearing, the debtor suggested that a 3% annual interest rate would be fair for the look-back aspect of Section 1228(b)(2). Allowing an additional point for risk above the nearly 2% average is appropriate. Therefore, as between the two rates suggested by the parties, 3% per year

---

[5]*See* Bureau of Labor Statistics, U.S. Department of Labor, Consumer Price Index, https://www.bls.gov/data/inflation_calculator.htm.

more accurately reflects the value of money since 2017; enforcing interest at a three year cumulative 18% (being 6% per year before compounding) would result in a windfall for Nutrien and other creditors that unfairly punishes Mr. Rouse.

To receive a chapter 12 hardship discharge now, Mr. Rouse must satisfy Section 1228(b) and the Liquidation Analysis from the Confirmed Plan as interpreted above. Imposing 3% interest on $50,687.00 as of the Effective Date and applying the $43,465.64 payments on the dates paid yields an unpaid balance of $11,339.62 as of August 15, 2020, plus per diem interest of $0.925 (calculated at 3% per annum) thereafter.[6] Whether Mr. Rouse chooses to pay this amount, or will instead move to convert the case to chapter 7 or dismiss it and file a new chapter 7 petition, is a matter governed by factors outside the scope of this opinion. A Hobson's choice of paying the unsecured class the stated balance or possibly incurring nondischargeable capital gain taxes may be the decisive factor.

## CONCLUSION

THEREFORE, the Motion for Hardship Discharge filed pursuant to 11 U.S.C. § 1228(b) is DENIED without prejudice. If the Motion is revised to account for the remaining payment amount consistent with this order, or if a separate amount is presented with the agreement of Nutrien and the Trustee after notice and due process for all affected parties, the question of hardship discharge matter can be reconsidered. Nothing in this order prevents Mr. Rouse from availing himself of chapter 7 relief and seeking a discharge there.

## END OF DOCUMENT

---

[6] Any amounts paid through the Trustee will require adding in his commission. Thus, the actual amount necessary to make final distribution would be $12,473.58 as of the stated date if the 10% full commission is incurred.